**MISSOURI PACIFIC RAILROAD COMPANY, Appellant,**

v.

**RIO BRAVO CATTLE COMPANY, Appellee.**

No. 14494.

Court of Civil Appeals of Texas.

San Antonio.

June 22, 1966.

Rehearing Denied July 20, 1966.

J. G. Hornberger, Laredo, Boyle, Wheeler, Gresham, Davis & Gregory, San Antonio, for appellant.

Hooper & Perry, Abilene, Robert O'Conor, Jr., Laredo, for appellee.

**152**

MURRAY, Chief Justice.

This suit was instituted by Rio Bravo Cattle Company, a Texas corporation, in the District Court, 49th Judicial District, Webb County, Texas, against Missouri Pacific Railroad Company, a Missouri corporation authorized to do business in Texas, seeking to recover for damages to 1,153 head of cattle allegedly caused by the failure of the Railroad Company to timely furnish railroad cars on February 24, 1963, for shipment of the cattle from the Mexican stock yard pens in Nuevo Laredo to the Union Stock Yards in Laredo, Texas.

The trial was to a jury and, based upon the verdict of the jury, judgment was rendered in plaintiff's favor in the sum of $5,052.33, after a remittitur by plaintiff of $697.67; from which judgment Missouri Pacific Railroad Company has prosecuted this appeal.

Appellant's first seven points are briefed together and present the contention that the trial court erred in submitting to the jury Special Issue No. 2, because it was duplicitous, multifarious, a comment on the weight of the evidence, and otherwise objectionable.

Appellee, Rio Bravo Cattle Company, contends that it entered into an oral contract with appellant, Missouri Pacific Railroad Company, to furnish it nineteen clean and sealed railway cattle cars, suitable for transporting 1,153 head of cattle from appellee's pens in Nuevo Laredo, Mexico, to Union Stock Yards in Laredo, Texas, a distance of some five miles.

The court's Special Issue No. 1, reads as follows:

"Do you find from a preponderance of the evidence that the defendant railroad company agreed to furnish suitable stock cars for the transportation of plaintiff's cattle from Nuevo Laredo, Mexico to Laredo, Texas?" The jury answered "Yes".

The court then instructed the jury, "If you have answered Special Issue Number One 'Yes' and in that event only, you will answer Special Issue Number Two."

Special Issue No. 2 reads as follows:

"Do you find from a preponderance of the evidence that the defendant railroad company failed to furnish railway stock cars *at the agreed loading point in Nuevo Laredo, Mexico, at the agreed time for furnishing same*, which were suitable for transportation of the plaintiff's cattle from Nuevo Laredo, Mexico, to Laredo, Texas?" (Emphasis ours.)

It will be noticed that Issue No. 1 only inquired as to whether appellant agreed to furnish stock cars for the transportation of appellee's cattle from Nuevo Laredo, Mexico, to Laredo, Texas, while Issue No. 2 asks whether appellant failed to furnish the cars at the agreed loading point in Nuevo Laredo, Mexico, at the agreed time for furnishing same. The appellant had raised an issue of fact as to whether there was any agreed time and place for furnishing the cars, however, in Issue No. 2 the court assumes that there was an agreement as to time and place, and asks only whether appellant failed to furnish cars at the time and place agreed on; or asks the two questions of whether or not (1) there was an agreement as to the time and place, and (2) if there was a failure to so furnish the cars. Mr. Hastings, general manager for "Miss Jovita Perez, Customhouse Broker," who handled appellee's cattle, testified that he was the one who made the arrangements for the cars. He said that on Saturday, February 23, 1963, he called the yard office of appellant and had the following conversation with whoever it was that answered the phone at the office:

"Q Now, would you tell the Jury, Mr. Hastings, just what transpired in your own words here, insofar as your negotiations with the defend-

ant, Missouri Pacific Railroad, on this occasion, are concerned?

A On the day before that Sunday, I believe it was February 25, I called the Missouri Pacific Railroad, the yard office—I don't recall who the person I talked to was at the time—and requested nineteen empty, clean, sealed railroad cars, for first crossing to go to the Mexican side of the border, and also requested that several more cars be placed to assure that should any car be found to be mechanically not suitable, that there would be enough suitable cars for loading these cattle which we proposed to export from Mexico and import the following day.

Q Had you handled similar matters on other occasions for Rio Bravo Cattle Company or other clients?

A We have, sir.

Q In your estimate, would you say it was many times or just a few times, or how many occasions?

A Many, many times.

Q You mentioned 'first crossing' of cattle, did you order these cars to be on the Mexican side or at the Mexican stockyards for first crossing in the morning?

A First crossing means to cross the American cars from the American side of the border to the Mexican side of the border at the first available moment, as early as possible the following morning, between 5:00, 6:00, 7:00 o'clock in the morning.

Q To the best of your ability to recall, did the agent or employee of Missouri Pacific Railroad agree to furnish such cars?

A They did, sir, or he did.

Q Mr. Hastings, were those cars available at first crossing the next morning?

A I don't know the exact time they crossed, but they got to the Mexican stockyards the first time around noon—no, yes, sir, about 3:00 o'clock as I recall. We wanted them there by noon, but they got there at 3:00 o'clock the first time."

This is all that appellee contends was said or done as to a contract with appellant to furnish cattle cars to it at the stock pens in Nuevo Laredo, Mexico, on February 24, 1963.

■ The evidence is insufficient to show that anyone authorized to make a contract on behalf of appellant agreed to furnish stock cars at the Mexican stock yard. Hastings does not say where the cars were to be furnished. It is not shown that the person to whom he talked was an agent authorized to make the contract appellee now claims to have had with appellant. Certainly, this evidence does not establish as a matter of law, the contract now claimed by appellee; at most it was only evidence of such contract and therefore only raised a question of fact to be decided by the trier of facts, in this case the jury.

■ It is true that in answer to the first issue the jury had found that appellant did agree to furnish suitable stock cars for the transportation of appellee's cattle from Nuevo Laredo, Mexico, to Laredo, Texas, but nothing more. When the court came to the submission of Issue No. 2, it asked about an entirely different contract than that described in Issue No. 1, that is, one to furnish such stock cars at *the agreed loading point in Nuevo Laredo, Mexico, at the agreed time for furnishing same.* Appellant contends there was no evidence to show that there was any agreed place to deliver the cars. This issue either assumes the fact that there was an agreement to furnish the stock cars at the Mexican stock yards at an agreed time, and inquires only as to whether there was a failure to so furnish such cars, or the issue asks two questions, one if there was an agreement to furnish the cars at the Mexican stock yards at a certain

time, and another, if there was a failure to so furnish the same. In either event, Issue No. 2 was subject to the objections made by appellant, and the court erred in not sustaining appellant's objections to that issue. Rule 277, Texas Rules of Civil Procedure; Johnson v. Zurich General Acc. & Liability Ins. Co., 146 Tex. 232, 205 S.W. 2d 353; Hornsby Heavy Hardware Co. v. Prichard, Tex.Civ.App., 119 S.W.2d 410, error dism.; Bonham Coca Cola Bottling Co. v. Jennings, Tex.Civ.App., 181 S.W. 97, error den. 143 Tex. 327, 184 S.W.2d 821.

■ We likewise sustain appellant's objection to Special Issue No. 3, inquiring of the jury whether the failure of the railroad company to furnish suitable railway cars at the designated place and at the agreed time, was negligence, for the same reasons stated above relating to Issue No. 2.

■ Special Issues Nos. 4 and 5, which were submitted to the jury, read as follows: (4) "Do you find from a preponderance of the evidence that such failure on the part of the defendant railroad company caused the plaintiff's cattle to shrink in weight?" (5) "Do you find from a preponderance of the evidence that the defendant's negligence, if any you have found, was the proximate cause of the shrinkage in weight to the cattle, if any you have found?"

The jury answered "Yes" to both of these issues. Appellant objected to the submission of these issues because there was insufficient evidence to support an affirmative answer to the issues.

The evidence shows that these cattle had been purchased in Durango, Mexico, by appellee and shipped to Nuevo Laredo stockyards. There were 1,161 head of these cattle. They were weighed in at the Nuevo Laredo stockyards on or about February 12, 1963, and weighed 434,944 pounds. When these cattle were finally sold in Laredo, Texas, on February 25, 1963, they weighed 422,851 pounds, and thus there was a loss in weight of 12,093 pounds between their arrival in Nuevo Laredo and their arrival in Laredo, Texas.

When these cattle were unloaded at the stockyards in Nuevo Laredo, three herds of them were found to have fever ticks and were ordered quarantined for a period of ten days by the U. S. Department of Agriculture. These three herds contained 451 head of cattle. Cattle cannot be imported into the United States from Mexico unless they are free from fever ticks.

It is not clear why the remaining cattle that were free from ticks were not immediately imported to the United States. Apparently, all of the cattle were put on feed consisting of cottonseed meal and hulls. The feed lot people were ordered to keep the feed troughs full of feed at all times, and inspections were made frequently to see that these orders were carried out. Appellee's witness Samuel Glen Ball testified that he was president of Rio Bravo Cattle Company, and that he and his wife were the principal stockholders; he had been in the cattle business for some ten years, and, as a matter of fact, he had grown up in the cattle business. He had been buying and selling cattle for appellee for ten years; he had bought lots of cattle in Mexico and imported them to the United States and sold them. The 1153 head of cattle involved here were purchased in Durango, Mexico, and shipped by rail to Nuevo Laredo stock yards; they were to be weighed when they arrived in Nuevo Laredo and were to be paid for by their weight in Nuevo Laredo. Four hundred fifty-one of these cattle arrived in Nuevo Laredo on or about Feb. 12, 1963, and were caught with ticks and placed in quarantine pens. Ball was not certain as to when the remainder of the cattle arrived. They were evidently tick free and were put in feed lots. All of the cattle were to be put on heavy feeding. There were 1161 head of cattle shipped by appellee from Durango to Nuevo Laredo and their total weight on arrival was 434,944 pounds. Some days later 1153 head of these cattle were shipped to Laredo, and when unloaded there

weighed 422,851 pounds, thus there was a shrinkage of 12,093 pounds. Part of this shrinkage apparently can be accounted for by the fact that eight head of these cattle were rejected and never reached Laredo. Ball testified that the cattle should have gained weight, due to the heavy feeding, even though 451 head were caught with ticks and had to be dipped twice before they could be imported to the United States. He further testified that appellee had imported many cattle from Mexico and they had always gained weight while in the Nuevo Laredo feeding pens. He undertook to give the details of some other shipments, as to the number of days the cattle were in the feed pens and the weight they gained but, as he did not have his books with him, this testimony was excluded and he was permitted to testify that the cattle always gained about 3% while in the feed lots. He did not state how many days these various heads of cattle were in the feed lots, whether or not they were caught with ticks and had to be dipped; and there was no description of the cattle, whether high breed cattle, horned cattle, or polls. The cattle here involved were weighed when they came to the stockyards in Nuevo Laredo but not at any time thereafter until they arrived at the Union Stock Yards in Laredo. There is no way to know how much these cattle gained, if any, while in the feed lots at Nuevo Laredo, or how much shrinkage was caused by the delayed arrival of the stock cars in Nuevo Laredo. There is no evidence herein from which a jury could compute with reasonable certainty the monetary loss caused by appellant's failure to timely furnish the stock cars.

Dr. Spruiell, as representative of the United States Department of Agriculture, started scratching the 451 head of cattle for ticks at about 7:00 a. m. on February 24, and would have been ready to start loading them by noon, and would have completed loading them by three or four o'clock that day, if the cars had been ready at noon when appellee had called for them. The cars arrived about 3:00 p. m., but were un-

sealed, not clean, and otherwise unsuitable. Dr. Spruiell would not permit the cattle to be loaded in these unsuitable cars. The cars were returned to the American side and later returned to the Nuevo Laredo pens. They were again found to be unsuitable and were returned to the American side. The next time the cars brought back to Nuevo Laredo they were found to be suitable; this was about 9:00 p. m. Due to this delay, the last of the cattle were not finally unloaded and weighed in Laredo until about 4:00 a. m. the next morning, which was Feb. 25. When they began scratching the 451 head of cattle for ticks at 7:00 a. m. on the morning of Feb. 24, they were taken off of feed and were not again put on feed until after they were unloaded and weighed in Laredo. It is not clear as to when the remaining 700 head of cattle were taken off of feed.

There would have been some shrinkage of the weight of the 451 head of cattle even if the stock cars had been spotted when needed, because these cattle had to be taken off of feed at 7:00 a. m., put through chutes and scratched for ticks, then dipped and put in draining pens. After they were drained, the cattle were put in tick-free pens called "clean pens" from which they were loaded into clean stock cars for import into the United States. These cattle would have been kept off of feed only about eight or nine hours if the cars had been ready when needed, while due to the delay in furnishing the cars they were kept off feed for some twenty or twenty-one hours.

Under all of this testimony, it would only be a guess as to how many pounds these cattle lost as a result of appellant's delay in furnishing clean and suitable stock cars for their shipment to Laredo. The evidence was insufficient to support the jury's answer to Special Issue No. 6, to the effect that $5,750.00, if paid now in cash, would fairly and reasonably compensate appellee for the damage suffered by it by reason of the loss of weight suffered by the cattle directly and proximately caused by appel-

lant. The cattle were not weighed before they were taken off feed, and therefore there is no way to know with any reasonable certainty what the shrinkage was in pounds between the time the cattle were taken off feed and the time they were weighed in Laredo, or what portion of this shrinkage was caused by the normal operation of shipping cattle to Laredo and what portion was due to the delay caused by failure to have the stock cars ready when needed.

Appellee sued for damages based on the following items:

| | | |
|---|---|---:|
| (1) | Weight loss | $2,479.07 |
| (2) | Failure to gain weight | 2,573.26 |
| (3) | Additional import costs | 470.15 |
| (4) | Supplemental feed | 277.50 |
| | Totaling | $5,799.98 |

The verdict of the jury was $5,799.98, showing that the jury intended that appellee should recover for the above items. The verdict was not supported by the evidence. Appellant could not be held liable for the failure of the cattle to gain weight.

The trial court gave the following instruction in connection with Issue No. 6:

"In fixing the amount, you will take into consideration the following elements:

(1) Loss of weight, if any, to the cattle by reason of the delay, if any, in furnishing suitable railroad cars, if you have found such delay to have occurred.

(2) The difference in weight between the time the cattle were weighed at the Nuevo Laredo, Mexico, pens and the time that they were weighed in at Union Stock Yards in Laredo, Texas, less a reasonable amount for natural or ordinary shrinkage, during that time.

(3) The reasonable value per pound of the cattle after it was received at the Union Stock Yards in Laredo, Texas."

This did not give the jury the correct measure of damages. The correct measure of damages for negligent delay in the shipment of cattle by the railroad is the difference in their market value in the condition in which they arrived at the point of destination, and in which they would have been but for the negligence complained of. Davis v. Hill, Tex.Civ.App., 271 S.W. 281.

In Kansas City, M. & O. Ry. Co. v. McMullen, Tex.Civ.App., 19 S.W.2d 98, 99, we find the following statement:

"The first proposition of appellant is that there is no evidence disclosed by the record upon which the jury could find the amount of damages awarded. After carefully reading the statement of facts, we sustain this contention. Nowhere do we find any evidence whatever of the market value of said cattle at Wichita, Kan., or at Big Lake, for that matter. There was evidence of negligence on the part of the railway company, of undue delay, and of shrinkage. It is elementary, however, that there must also be evidence upon which the jury can arrive at the amount of pecuniary damages resulting from the negligence shown. 17 C.J. 1023; Coulter v. Gulf, C. & S. F. R. Co. (Tex. Civ.App.) 286 S.W. 559."

See also Panhandle & S. F. R. Co. v. Montgomery, Tex.Civ.App., 140 S.W.2d 241.

There is evidence as to what these cattle sold for per pound in Laredo, but no evidence that the price paid was the market value of the cattle; neither is there any evidence as to the difference in market value of the cattle in the condition in which they arrived and the market price in the

condition in which they would have arrived but for the negligence of appellant.

For the error above pointed out, the judgment is reversed and the cause remanded.